[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter is before the Court on the appeal of Edward Pezzi ("Appellant") from a decision of the Zoning Board of Review of the City of Warwick ("Board"). The Board's decision granted the request of Accrington Realty, LLC ("Applicant" or "Accrington") for dimensional relief necessary to construct a proposed single-family dwelling on a substandard lot. Jurisdiction is pursuant to G.L. (1956) § 45-24-69.
 Facts and Travel
The Applicant owns waterfront property located on Hermit Drive in the City of Warwick, Rhode Island, otherwise identified as Warwick Assessor's Plat 361, Lot 877 ("Lot 877" or "Property"). Lot 877, located on the Brush Creek Cove waterfront, is an irregularly shaped vacant lot that measures 82,764 square feet and includes a large representation of wetlands. In addition, Lot 877 is zoned residential A-40 and situated in a flood hazard overlay district including both the flood zone area AE-14 and velocity zone area VE-18.
The creation of Lot 877 and abutting Lot 878 occurred as a result of a two-lot minor subdivision approved by the Warwick Planning Board in 2000. The owners of the two lots at the time of the subdivision — Richard and Russell Lacy — conveyed Lot 878 to the Warwick Sewer Authority for use as a pumping station and also provided the Sewer Authority with an easement along Lot 877.
In 2003, Accrington purchased Lot 877 and abutting Lot 813. Although a legally created existing lot of record, Lot 877 is considered a nonconforming lot because it lacks the minimum frontage of 150 feet required for lots in an A-40 zone. Conversely, Lot 813 — located in an A-7 zone — is a conforming lot because it satisfies the minimum total square footage and frontage requirements.[1]
The Applicant wants to construct a single-family dwelling on Lot 877 with dimensions of 24 x 34 and an attached 10 x 12 foot deck.[2] Although the dwelling would be three levels, the first floor would not be utilized as living space. Because the undersized lot is located in an A-40 residential zone, construction of the proposed single-family dwelling mandates substantial zoning relief in the form of dimensional variances from various setback requirements established in the Warwick Zoning Ordinance ("Ordinance").
Pursuant to Ordinance § 906.1 and G.L. (1956) § 45-24-41(a), the Applicant applied to the Board for the necessary dimensional relief to accommodate the proposed construction. The Board designated the application as Petition 8981. The original site plan demonstrated that the proposed construction would result in a 20 foot frontage on Hermit Drive, a 25 foot setback to the coastal feature, a front setback of 10 feet, and a height of 40 feet. However, to construct a residential dwelling in an A-40 zone, the Ordinance requires that any structure built on the subject lot maintain a minimum frontage of 150 feet, a front setback of 38 feet, a minimum 50 foot setback from a coastal feature, and not exceed 35 feet in elevation. See Ordinance Table 2A — Dimensional Regulations.[3] Consequently, the Applicant's proposal requires dimensional variances from the minimum specifications listed in the Ordinance for frontage, front-yard setback, maximum structure height, and coastal feature setbacks.
In compliance with Ordinance § 906.2(B) and G.L. (1956) §45-24-41(b), the Board conducted public hearings on the Applicant's request for dimensional relief on July 13, 2004 and August 10, 2004. At the onset of the July hearing, the Board heard testimony from Mr. DePasquale, who spoke on behalf of the Warwick City Planning Department ("Planning Department"). After reviewing Petition 8981, DePasquale expressed concerns regarding the setback to abutting residential property and coastal features, the size of the proposed deck, the potential for non-point source pollution, and the possible threat to the extensive wetlands areas.
To mitigate these concerns, the Planning Department requested that the Applicant hire an environmental professional to assess non-point source pollution[4] and evaluate the effectiveness of the proposed wetland setback. Additionally, the Planning Department suggested that the Applicant decrease the size of the deck, explore alternate house designs, and employ best management practices to mitigate non-point source pollution. Finally, the Planning Department requested that the Board condition approval of Petition 8981 on three stipulations: (1) connection of the proposed dwelling to the municipal sewer system; (2) approval of the plan by the Coastal Resources Management Council; and (3) submission of an accurate revised site plan including a note that details the best management to be employed.
Following the testimony of Mr. DePasquale, the Applicant submitted a revised plan to address the concerns raised by the Planning Department. The revised plan shifted the house an additional ten (10) feet off the property line and reduced the deck size from approximately 10 x 24 feet to 10 x 12 feet. Despite these concessions, the revised site plan required the identical relief necessary to facilitate the original plan.
The Applicant then offered the testimony of three experts. First, the Applicant presented Edward Pimental as a land use expert. Based on an analysis of the Property and the surrounding neighborhoods, Pimental opined that the proposed construction would coincide with the character of the neighborhood which is primarily an older, overdeveloped beach community. He testified that no lot in a 200-foot radius of Lot 877 complies with the requirements for construction in an A-40 zone and the average lot fails to meet even the lesser A-7 zoning standards.[5]
Furthermore, he stated the location selected necessitated the least amount of relief because relocation of the structure, while possible, would require either a larger coastal feature setback or a larger front yard setback.
Second, the Appellant offered the testimony of real estate expert Robert DeGregorio. DeGregorio echoed Pimental's statement that the neighborhood is predominantly nonconforming waterfront property. He opined that the proposed construction was compatible with the Comprehensive Plan and would increase the home values in the neighborhood. DeGregorio posited that the shape of the Property, the pervasive wetlands, and the limited ingress and egress to and from Hermit Drive severely limit the area suitable for development. He concluded that it would be impossible to construct a dwelling that would comply with the Ordinance, and the refusal to grant the requested setbacks would leave the applicant with no other reasonable alternative to enjoying the land.
Finally, Scott Rabideau testified extensively for the Applicant as an expert in coastal biology. Acknowledging that Brush Neck Cove is a Type 1 coastal water body and conservation area, Rabideau emphasized the need to implement protective measures. He testified that the following measures were part of the plan: 1) an erosion and sedimentation control plan; 2) the construction of all roof leaders from the house to flow into drywells to help mitigate any non-point source runoff; 3) the placement of hay bales along the wetland edge to prevent erosion into the wetlands; and 4) the stockpiling of clean fill only.
According to Rabideau, the plan requires minimal disturbance to vegetation on the Property. Additionally, Rabideau stated that the unique characteristics of the land made the proposed location of the dwelling the only viable alternative due to the need to preserve the buffer zone and the limited ingress and egress to Hermit Drive. Finally, he stated that the height of the dwelling is unavoidable because the Lot is located in a flood zone, the elevation of the structure must start at elevation 14.
Following the conclusion of expert testimony, the Board heard comments from abutting property owners — Kevin Bier, Carol Ranucci, James Fahey, and Sabatino Ranucci — who objected to the height of the proposal, the size of the dwelling, the scope of the requested setbacks, and the impact on water views and the value of the surrounding land. In addition, the Appellant raised numerous specific concerns to the Board. The Appellant pointed out that Accrington owns both Lot 877 and the abutting Lot 813. The Appellant also highlighted a mistake on the revised site plan which reflect a forty-foot frontage on Hermit Drive. As evidenced by the original site plan, the correct frontage was twenty (20) feet.
At the conclusion of the hearing, the Board approved a suggestion to continue the meeting to allow the Applicant to attempt to negotiate and alleviate concerns raised by the objectors. Nevertheless, at the August hearing, the Applicant's counsel reported that the parties could not reach an agreement and proceeded to clarify the details of the minor subdivision which created Lot 877 in 2000. The Board then put Petition 8981 to a vote. After consideration of the testimony presented at the public hearing, the documentation provided in support of the application, the Board voted unanimously to approve the application subject to the conditions suggested by the Planning Department.
Pursuant to Ordinance § 908 and G.L. (1956) § 45-24-69, the Appellant timely filed the instant appeal in Kent County Superior Court on September 30, 2004. After receiving the briefs submitted by both parties, the Court is now prepared to render a decision on the merits of the instant appeal.
 STANDARD OF REVIEW
Section 45-24-69 confers jurisdiction on the Superior Court to review the decision of a zoning board. Section 45-24-69(d) provides in relevant part:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
"[T]he Superior Court reviews the decisions of a plan commission or board of review under the "traditional judicial review" standard applicable to administrative agency actions." Restivov. Lynch, 707 A.2d 663, 665 (R.I. 1998). The Superior Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute his or her findings of fact for those made at the administrative level." Id. at 665-66 (quoting Lett v. Caromile, 510 A.2d 958, 960 (R.I. 1986)).
"The trial justice may not substitute [his or her] judgment for that of the zoning board if [he or she] can conscientiously find that the board's decision was supported by substantial evidence in the whole record." Mill Realty Assocs. v. Crowe,841 A.2d 668, 672 (R.I. 2004) (quoting Apostolou v. Genovesi,120 R.I. 501, 509, 388 A.2d 821, 824-25 (1978)). "Substantial evidence means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Lischio v.Zoning Board of Review of the Town of North Kingstown,818 A.2d 685, 690, n. 5 (R.I. 2003) (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)).
To support his argument for reversal of the Board's decision, the Appellant raises four primary arguments. First, the Appellant contends that he never received notice of the August 10, 2004 public hearing as required by § 45-24-41(b). Second, the Appellant claims that the forced merger provision of the Ordinance requires Lot 877 and Lot 813 to merge due to common ownership. Third, the Appellant claims that the Applicant failed to demonstrate that denial of the requested relief would result in a deprivation of all beneficial use. Finally, the Appellant argues that the Board's decision lacks competent evidentiary support in the record because the Board mistakenly relied on the Applicant's initial representation that the Property had a 20 foot frontage on Hermit Drive. The Court will address each of the Appellant's arguments seriatim.
 Notice
First, the Court will begin with the Appellant's allegation that the Board failed to comply with the notice provisions of §45-24-41(b). Section 45-24-41(b) reads in relevant part:
 "The zoning board shall hold a public hearing on any application for variance in an expeditious manner, after receipt, in proper form, of an application, and shall give public notice at least fourteen (14) days prior to the date of the hearing in a newspaper of general circulation in the city or town. Notice of hearing shall be sent by first class mail to the applicant, and to at least all those who would require notice under § 45-24-53. The notice shall also include the street address of the subject property. A zoning ordinance may require that a supplemental notice, that an application for a variance is under consideration, be posted at the location in question. The posting is for information purposes only and does not constitute required notice of a public hearing."
The Appellant claims that he had no notice that the August hearing would begin at 6 p.m. — one hour earlier than the July hearing. As a result, he missed the portion of the hearing devoted to Petition 8981 because he arrived at 7 p.m. When he arrived, he immediately addressed this argument to the Board. In response, the Chairman of the Board responded:
 "[W]e changed [the start time] and we made an announcement [at the July hearing] that future meetings of the board would be at 6 p.m. It was advertised in the paper at 6 p.m. And I'm sorry if you didn't get a copy, but it was mailed out." Tr. of Conversation between Board Chairman and Pezzi 3:1-7 (August 10, 2004).
In addition to the announcement at the July hearing, the Board offered the affidavit from Carol Chevalier, the Board Secretary, regarding notices sent. She averred that she published an ad in the Warwick Beacon on July 27, 2004 setting forth the date, time, and location of the August 10, 2004 hearing. Also, she attested that she sent notice via first class, pre-paid mail to all abutting property owners entitled to notice under § 45-24-53. She provided a list of all property owners to whom individual notices were sent; the Appellant is on this list. Chevalier claimed that only one notice, not addressed to Pezzi, was returned as undeliverable.
After submissions by all parties in accordance with the briefing schedule established by the Court, the Appellant filed a supplemental brief on July 11, 2005. In his supplemental brief, he alleged — for the first time — that fourteen (14) individuals failed to receive notice. The Appellant attached affidavits from the fourteen abutting property owners who claim that — although they received notice of the July hearing — they did not receive notice of the August hearing.
Upon review of the fourteen nearly identical affidavits, the Court identified three primary problems. First, six of the affidavits were generated by individuals who jointly own property. Carol and Sabatino Ranucci jointly own Assessor's Plat 361, Lots 256, 257, 871; Patricia Abbott and Paul Abbott jointly own Assessor's Plat 361, Lot 262; and Kevin Bier and Michelle McDonald Bier jointly own Assessor's Plat 361, Lots 263 and 265. Similarly, Geraldine McGinnis is one of four joint owners of Lot 331, and Beverly Sturdahl is one of four owners of Lot 333. The affidavits present no evidence or description of the relationship between these joint owners. This information is important because the Board is only required to send one notice to a husband and wife who have the same mailing address. See Sweetman v. Townof Cumberland, 117 R.I. 134, 143-144, 364 A.2d 1277, 1284-85
(1976).
The second major problem with the affidavits is the Court has no evidence as to whether the affiants actually attended the meeting. "When a party appears before a zoning board of review and avails himself of the opportunity to present his position to the board, he thereby waives his right to object to any alleged deficiencies of notice." Zeilstra v. Barrington Zoning Board ofReview, et al., 417 A.2d 303, 307 (R.I. 1980).
Finally, the Board gave people who objected to Petition 8981 the opportunity to be heard at the July hearing. Of the fourteen affidavits, five of these individuals did voice their objections at the July hearing. At the August hearing, the Applicant's counsel basically informed the Board that negotiations with the objectors were unsuccessful and clarified the details of the 2000 minor subdivision. Neither the Applicant nor any one of his three experts placed additional testimony on the record.
Even assuming the Court found these affidavits completely credible, the fact that certain property owners did not receive notice sheds no light on whether the Board properly sent notice. "To be sufficient, the notice sent `must be reasonably calculated, in light of all the circumstances, to apprise the interested parties of the pendency of the action, of the precise character of the relief sought and of the particular property to be affected.'" Id. (quoting Paquette v. Zoning Board of Reviewof West Warwick, 118 R.I. 109, 111, 372 A.2d 973, 974 (1977)). The Board has a duty to send notice in accordance with the dictates of § 45-24-41(b) and the Ordinance § 906.2(B). Neither the § 45-24-41(b) nor Ordinance § 906.2(B) requires that the Board — after properly dispatching notice — must ensure that each individual property owner actually received said notice. Consequently, once notice is properly dispatched to the appropriate owners, the Board has satisfied its duty.
From the evidence presented, it appears that the Board complied with the notice requirements set forth in the statute by mailing individual notices to the attached list of abutting property owners and publishing an advertisement in the Warwick Beacon. Without effectuating personal service on each individual property owner entitled to receive notice — a costly and wholly unnecessary measure — the Board cannot be charged with guaranteeing notice delivered. Consequently, the Court finds that the reliable evidence on the record contradicts the Appellant's allegation that the Board failed to send sufficient notice.
 Merger
As part of the Zoning Enabling Act, section 45-24-38 authorizes a city or town to include provisions in its zoning ordinance with respect to merger.
 "Provisions may be made for the merger of contiguous unimproved, or improved and unimproved, substandard lots of record in the same ownership to create dimensionally conforming lots or to reduce the extent of dimensional nonconformance. The ordinance shall specify the standards, on a district by district basis, which determine the mergers." § 45-24-38.
Invoking its discretion under § 45-24-38, the Board drafted Ordinance § 405.2 to read:
 "If two or more abutting nonconforming lots are held in the same ownership as of June 20, 1988 or subsequent thereto, such lots shall be combined for the purposes of this ordinance in order to conform or more nearly conform to any of the dimensional requirements of this ordinance for the district in which the lots are located and such lots shall not be sold separately."
The Appellant argues that the Court should order a forced merger of Lot 877 and Lot 813 because the lots abut one another and have common ownership. Despite the proximity of the lots and the commonality of ownership, the Appellant ignores the clear and unambiguous language of the Ordinance which adds a third factor to the equation. Specifically, Ordinance § 405.2 requires that merger apply to two or more nonconforming lots. Although Lot 877 is nonconforming, Lot 813 is conforming. The application of a forced merger to one conforming lot and one nonconforming lot would contravene the language of the Ordinance and operate an impermissible expansion of the merger provision. Consequently, the Court rejects the Appellant's attempt to effect a forced merger of Lot 877 and Lot 813.
 Dimensional Relief
Section 45-24-31(61)(ii) defines a dimensional variance as:
 "Permission to depart from the dimensional requirements of a zoning ordinance, where the applicant for the requested relief has shown, by evidence upon the record, that there is no other reasonable alternative way to enjoy a legally permitted beneficial use of the subject property unless granted the requested relief from the dimensional regulations."
In order to obtain a dimensional variance, Ordinance § 906.3 (A) sets forth the four-prong standard which an applicant must satisfy to obtain relief:
 (1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not the general characteristics of the surrounding area, and is not due to the physical or economic disability of the applicant;
 (2) That said hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 (3) That the granting of the requested variance will not alter the general characteristics of the surrounding area or impair the intent or purpose of this zoning ordinance or the comprehensive plan of the city;
 (4) That the relief to be granted is the least relief necessary.[6]
The Appellant argues that the Applicant failed to demonstrate that the denial of the requested dimensional relief would result in the deprivation of all beneficial use. The Appellant's argument is legally infirm. After the Rhode Island Supreme Court's decision in Lischio v. Zoning Bd. of Review of the Townof N. Providence, 818 A.2d 685 (R.I. 2003), deprivation of all beneficial use is no longer the applicable standard. Recognizing the harsh results of such a stringent standard, the Court held that an applicant must demonstrate "that the hardship the applicant would suffer if the dimensional relief is not granted amounts to more than a mere inconvenience." Lischio,818 A.2d at 691 (quoting § 45-24-41(d)(2)).[7]
A brief legislative and judicial history tracing the evolution of the applicable requisite degree of hardship may be helpful. From 1960 until 1991, the judicially created doctrine in Viti v.Zoning Board of Review of Providence, 92 R.I. 59, 166 A.2d 211
(1960), established the proposition that applicants for a dimensional variance need only show that the hardship that would result from the denial of a request for dimensional relief amounts to more than a mere inconvenience. As such, applicants "who wanted to establish a right to dimensional relief were not required to demonstrate a loss of all beneficial use of the parcel in the absence of [dimensional relief.]" Lischio,818 A.2d at 691 (citing Viti, 92 R.I. at 64-65, 166 A.2d at 213).
In 1991, the General Assembly amended § 45-24-41(d)(2) to reflect a more stringent degree of demonstrable hardship. The 1991 amendment, which superseded the Viti Doctrine, read in pertinent part:
 "That the hardship that will be suffered by the owner of the subject property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property." P.L. 1991 ch. 307, § 1 (emphasis added). From 1991 until 2002, the Court adhered to and applied this heightened standard. See von Bernuth v. Zoning Board of Review, 770 A.2d 396 (R.I. 2001) (discussing effect of 1991 Amendment to § 45-24-41(d)(2) heightening requisite degree of hardship); Sciacca v. Caruso, 769 A.2d 578 (R.I. 2001) (same). Because the last revision of the Ordinance occurred in 2001, Ordinance § 906.3 (B)(2) adopted the language used in the 1991 Amendment. As such, the section reads in relevant part:
 "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted shall not be grounds for relief."
Nevertheless, in 2002, the General Assembly again amended §45-24-41(d)(2) by removing the language added in 1991 thereby reincarnating the lesser standard represented by the Viti
Doctrine:
 "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience." P.L. 2002, ch. 384, § 1.
It is important to recognize that the amended version of §45-24-41(d)(2) controls the standard of review, because it effectively preempts the Ordinance language. As articulated in Ordinance § 102, "This ordinance is set forth in compliance with G.L. 1956 §§ 45-24-27 [through] 45-24-72 (as amended), also known as the Rhode Island Zoning Enabling Act of 1991." In addition, the Rhode Island Supreme Court has unequivocally stated that the authority of a zoning board is circumscribed by the terms of the zoning enabling act, and "the jurisdiction thereby conferred can neither be expanded nor diminished by the terms of an ordinance."Lincourt v. Zoning Board of Review of Warwick, 98 R.I. 305,309, 201 A.2d 482, 485 (1964). Because the instant case arose subsequent to the 2002 amendment, the Court will apply the lesser standard codified in § 45-24-41(d)(2) rather than Ordinance § 906.3(B)(2). As such, to satisfy the first prong of the standard, the Appellant must show that any hardship caused by the denial of his request for dimensional relief amounted to more than a mere inconvenience.
In its written decision, the Board concluded that the proposed construction satisfied each of the four prongs necessary to obtain dimensional relief. The Board based these conclusions on various findings of fact including: (1) the proposed location is the only area suitable for the Applicant to construct a dwelling; (2) the majority of the Property is wetlands and the proposed location is the only reasonable area on the lot to place the dwelling; (3) a new dwelling would be an asset to the area. Given the extensive testimony the Applicant presented from a land use expert, a real estate expert, and an environmental expert, the Court holds that the findings made by the Board are based on record evidence and support the conclusion that denial of the relief requested by the Applicant would result in more than a mere inconvenience.
 The Decision of the Board
The last argument raised by the Appellant is that the Board's decision is not supported by competent evidence in the record because the initial testimony presented by the Applicant and the revised site plan incorrectly stated that the frontage on Hermit Drive was 40 feet. The Board's written decision belies the Appellant's argument that the Board mistakenly relied on an incorrect frontage measurement. Specifically, paragraph 8 notes that the Property has a 20 foot frontage on Hermit Drive. Furthermore, the mistake was noted at the July hearing, and the Board members were made aware of the error. Accordingly, the Court will not infer — without more — that the Board mistakenly relied on incorrect dimensions when the correct dimensions are referenced in the written decision.
 Conclusion
The Court has carefully reviewed the arguments raised by both parties and the entire record of the proceedings before the Board. For the foregoing reasons, the Court finds that the Board's decision is supported by the substantial and probative evidence on the record. Accordingly, the decision of the Board approving Petition 8981 is hereby affirmed. Counsel shall submit an appropriate form of judgment for entry.
[1] Conforming lots in an A-7 zone must have a minimum frontage of 50 square feet and at least 7,000 total square feet. Lot 813 has a frontage of 52.36 feet and 9,662 total square feet and a frontage of 52.36 feet.
[2] The Board's decision states that the dimensions of the proposed dwelling are 24x22; however, the revised site plan clearly depicts a dwelling that is 24x34 feet. The addition of the deck increases the dimensions to 24 x 44 feet. Despite this error, the requested setbacks remain the same. Consequently, this is not a material error.
[3] Numerous references exist to Ordinance § 405.4(B) which states that when the proposed construction of a new dwelling which meets setback requirements for front and corner side yard, side yard, and rear yard, the applicant need not apply for dimensional relief if the property has at least a 50 foot frontage. As such, the section effectively exempts an applicant from undergoing the arduous process necessary to obtain zoning relief where the only outlier is an insufficient frontage requirement. However, the instant case does not qualify for this exemption, because it requires a variance from the front setback requirement. Consequently, the continued references to a minimum fifty-foot frontage are misleading. The required frontage for construction in an A-40 zone is 150 feet, not 50 feet.
[4] Point source pollution is that which can be attributed to a specific source such as a pipe, a ditch, or sewage overflow. Non-point source pollution is that which is difficult to pinpoint, such as stormwater runoff, landfill seepage, or erosions and sedimentation from construction activities. SeeComprehensive Plan, Land Use Element, p. 61.
[5] Pimental's analysis calculated the average lot size in the neighborhood at 6,892 square feet.
[6] The standard set forth in § 906.3(A) of the Ordinance is substantially similar to G.L. (1956) § 45-24-41(c) which reads: "(c) In granting a variance, the zoning board of review requires that evidence to the satisfaction of the following standards is entered into the record of the proceedings:
(1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant, excepting those physical disabilities addressed in § 45-24-30(16);
(2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
(3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based; and
(4) That the relief to be granted is the least relief necessary."
[7] It should be noted that the hardship language contained in § 45-24-41(d)(2) and Ordinance § 906.3(B)(2) refers exclusively to dimensional variances and does not apply to use variances.